BRIAN D. CAPLAN
EDWARD P. GROSZ
REITLER KAILAS & ROSENBLATT LLC
885 Third Avenue, 20th Floor
New York, New York 10022
(212) 209-3050
*Attorneys for Plaintiff*
*b.I.G.f.a.c.e. Entertainment, Inc. f/s/o*
*Lavell Crump p/k/a David Banner*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YOR

| | |
|---|---|
| b.I.G.f.a.c.e. ENTERTAINMENT, INC. f/s/o LAVELL CRUMP p/k/a DAVID BANNER, | CASE NO. ___CV___( ) |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| YOUNG MONEY ENTERTAINMENT, LLC, | |
| Defendant. | |

Plaintiff b.I.G.f.a.c.e. Entertainment, Inc. f/s/o Lavell Crump p/k/a David Banner ("Plaintiff"), by and through its attorneys Reitler Kailas & Rosenblatt, LLC, for its Complaint against defendant Young Money Entertainment, LLC ("YME" or "Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff and the Defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

2.      This Court has personal jurisdiction over Defendant YME because, upon information and belief, Defendant YME does business in the State of New York.

168526

3.     This Court has personal jurisdiction over Defendant YME because this case arises out of the transaction of business within the State of New York.

4.     This court has personal jurisdiction over Defendant YME because, pursuant to agreements at issue in this case, described more fully below, YME agreed to submit to the jurisdiction of the state and federal courts of New York in connection with any disputes arising out of those agreements.

5.     Venue is proper in New York County because, pursuant to Section 21(a) of the 2008 Agreement at issue in this case, described more fully below, the parties agreed that "All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the United States District Courts located in New York County."

## THE PARTIES

6.     Plaintiff b.I.G.f.a.c.e. Entertainment, Inc. is a Delaware corporation, with its principal place of business located at 3495 Buckhead Loop #18707, Atlanta, Georgia 31126.

7.     Defendant YME is, upon information and belief, a limited liability company organized and operating under the laws of the State of Florida with offices for the conduct of is business c/o Ronald Sweeney, Esq. located at 170 Broadway, 10th Floor, New York, New York 10019.  Upon information and belief, none of the members of YME is a citizen of either the State of Delaware or the State of Georgia.

## BACKGROUND

8.     Plaintiff is engaged in the business of, among other things, producing sound recordings for commercial exploitation by record companies.

9.     Dwayne Carter, p/k/a Lil Wayne ("Carter"), is a recording artist and performer.

168526

10.     Upon information and belief, Defendant YME was founded by Carter and, among other things, acts as the exclusive company furnishing the professional services of Carter.

11.     Upon information and belief, Carter conducts his business through and under the business name of YME.

### The 2008 Agreement

12.     The parties entered into a written agreement dated as of February 8, 2008 (the "2008 Agreement").  A copy of the 2008 Agreement is annexed hereto as Exhibit "A" and is incorporated by reference and made a part hereof.

13.     Pursuant to the 2008 Agreement, Defendant engaged Plaintiff to furnish the non-exclusive personal services of Lavell Crump p/k/a David Banner ("Banner") to produce two master recordings entitled "La La" and "Pussy Monster" for possible inclusion on an album embodying Carter's musical performances.

14.     As consideration for the production services rendered under the 2008 Agreement, Defendant, among other things, agreed to pay Plaintiff specified royalties and other compensation.

15.     Pursuant to Paragraph 6 of the 2008 Agreement, Defendant agreed to cause accounting statements reflecting all royalties accrued under the terms of the 2008 Agreement during the subject accounting period to be sent to Plaintiff no less than semi-annually, accompanied by payment of all sums thereby shown to be due and owing to Plaintiff.

16.     Plaintiff timely performed its obligations under the 2008 Agreement.

17.     The master for "La La" was commercially released on June 10, 2008 as a track on the Lil Wayne Album entitled, "Tha Carter III."

168526

18.     "Tha Carter III" Album has been hugely successful; it earned a Grammy Award for Rap Album of the Year and has sold over 4 million copies in the United States alone.

19.     In breach of the 2008 Agreement, Defendant failed to timely provide any payment to Plaintiff for the semi-annual accounting period ending December 31, 2012 (the "December 2012 Accounting Period"), or for any semi-annual accounting period thereafter.

20.     Defendant provided Plaintiff with an accounting for the semi-annual period ending December 31, 2012, showing that $138,787.19 was due and owing to Plaintiff.  However, in breach of the 2008 Agreement, no payment in that amount has been made, and no payment has been made for any semi-annual accounting period subsequent to the December 2012 Accounting Period.

21.     By letter dated July 3, 2014, Plaintiff's counsel notified Defendant of its material breaches of the 2008 Agreement by failing to provide any payments for the December 2012 Accounting Period or any period thereafter, and by failing to provide any accounting for any semi-annual accounting period subsequent to the December 2012 Accounting Period, and demanded that Defendant cure its breaches.

22.     Defendant failed, neglected or refused to timely cure its breaches of the 2008 Agreement identified in the July 3, 2014 letter, including but not limited to, its failure to pay all royalties due to Plaintiff under the 2008 Agreement.

### The 2009 Agreement

23.     The parties entered into a written agreement dated as of December 11, 2009 (the "2009 Agreement").  A copy of the 2009 Agreement is annexed hereto as Exhibit "B" and is incorporated by reference and made a part hereof.

168526

24.     Pursuant to the 2009 Agreement, Defendant engaged Plaintiff to furnish the non-exclusive personal services of Banner to produce one master recording entitled "Streets is Watchin" for possible inclusion on an album entitled "We Are Young Money."

25.     As consideration for the production services rendered under the 2009 Agreement, Defendant, among other things, agreed to pay Plaintiff specified royalties and other compensation.

26.     Pursuant to Paragraph 6 of the 2009 Agreement, Defendant agreed to cause accounting statements reflecting all royalties accrued under the terms of the 2009 Agreement during the subject accounting period to be sent to Plaintiff no less than semi-annually, accompanied by payment of all sums thereby shown to be due and owing to Plaintiff.

27.     Plaintiff timely performed its obligations under the 2009 Agreement.

28.     The master for "Streets is Watchin" was commercially released on December 21, 2009 as a track on the YME Album entitled, "We Are Young Money."

29.     In breach of the 2009 Agreement, Defendant failed to timely provide any payment to Plaintiff for the December 2012 Accounting Period, or for any semi-annual accounting period thereafter.

30.     Defendant provided Plaintiff with an accounting for the semi-annual period ending December 31, 2012, showing that $15,392.57 was due and owing to Plaintiff.  However, in breach of the 2009 Agreement, no payment in that amount has been made, and no payment has been made for any semi-annual accounting period subsequent to the December 2012 Accounting Period.

31.     By letter dated July 3, 2014, Plaintiff's counsel notified Defendant of its material breaches of the 2009 Agreement by failing to provide any payments for the December 2012

168526

Accounting Period or any period thereafter, and by failing to provide any accounting for any semi-annual accounting period subsequent to the December 2012 Accounting Period, and demanded that Defendant cure its breaches.

32.     Defendant failed, neglected or refused to timely cure its breaches of the 2009 Agreement identified in the July 3, 2014 letter, including but not limited to, its failure to pay all royalties due to Plaintiff under the 2008 Agreement.

### FIRST CLAIM FOR RELIEF
**(Breach of the 2008 Agreement)**

33.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 32 above as if set forth herein at length.

34.     By reason of the foregoing, Defendant has materially breached the 2008 Agreement.

35.     Plaintiff has satisfactorily performed all of its obligations to Defendant under the 2008 Agreement.

36.     As a direct and proximate result of Defendant's breaches of the 2008 Agreement, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $138,787.19.

### SECOND CLAIM FOR RELIEF
**(Breach of the 2009 Agreement)**

37.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36 above as if set forth herein at length.

38.     By reason of the foregoing, Defendant has materially breached the 2009 Agreement.

168526

39.     Plaintiff has satisfactorily performed all of its obligations to Defendant under the 2009 Agreement.

40.     As a direct and proximate result of Defendant's breaches of the 2009 Agreement, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $15,392.57.

**WHEREFORE**, Plaintiff demands judgment as follows:

a)     On the First Claim for Relief, an award of damages to Plaintiff in an amount to be determined at trial, but not less than $138,787.19, plus prejudgment interest thereon; and

b)     On the Second Claim for Relief, an award of damages to Plaintiff in an amount to be determined at trial, but no less than $15,392.57, plus prejudgment interest thereon; and

c)     An award to Plaintiff of the costs and disbursements incurred in this action; and

168526

      d)      Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       July 27, 2015

                        REITLER KAILAS & ROSENBLATT LLC

By    _____
          Brian D. Caplan
          Edward P. Grosz
          885 Third Avenue, 20th Floor
          New York, New York 10022
          (212) 209-3050
          *Attorneys for Plaintiff*
          *b.I.G.f.a.c.e. Entertainment, Inc. f/s/o*
          *Lavell Crump p/k/a David Banner*

168526

Exhibit A

PRODUCER AGREEMENT

AGREEMENT made and entered into as of this 8th day of February, 2008, by and between Young Money Entertainment, LLC ("Company") f/s/o Dwayne Carter p/k/a "Lil Wayne" ("Artist"), c/o Law Offices of Ronald E. Sweeney, 222 Riverside Drive, PH5A, New York, NY 10025, on the one hand, and b.I.G.f.a.c.e. Entertainment, Inc. ("you") f/s/o Levell Crump p/k/a "David Banner" ("Producer"), c/o Mark Music and Media Law, PC, 1900 Avenue of the Stars, 25th Floor, Los Angeles, CA 90067, Attention: Douglas Mark, on the other hand.

The parties hereby agree as follows:

1.      Employment and Term.

        (a)      Company hereby engages you to furnish the non-exclusive personal services of Producer to produce two (2) master recordings entitled "La," and "Pussy Monster" (the "Master(s)") embodying the musical performances of Artist for possible inclusion on Artist's forthcoming album (the "Album") tentatively entitled "Carter III" to be distributed by Cash Money Records ("Distributor") pursuant to that certain recording agreement between Company and Distributor dated November 1, 1998, as heretofore amended ("Recording Agreement"). You accept such engagement and agree to cause Producer to render such production services for Company during the Term hereof upon the terms and conditions hereinafter set forth. In the event the number of master recordings produced hereunder is no more than one (1), then all references to "Masters" hereunder shall be read and deemed to refer to one (1) "Master."

        (b)      The term of this Agreement shall commence upon the date hereof and shall continue until you and Producer have fulfilled all of your obligations hereunder (the "Term").

2.      Services.

        (a)      The times and places of all recording sessions produced hereunder, the selections to be recorded at such recording sessions, the accompanying artists (vocal and instrumental) to perform at such recording sessions and the other creative and technical personnel to be utilized shall be mutually designated by you, Artist and Company. Company shall have the right and opportunity, at its own expense, to have its representatives attend each recording and mixing session.

        (b)      With respect to the Masters produced hereunder, and unless Company otherwise agrees in writing:

                (i)      Each Master shall embody the studio performance by Artist of a selection approved by Artist and Company and not previously recorded by Artist, shall be recorded in a first-class recording studio, and shall not embody any so-called "live" performances of Artist.

- 2 -

     (ii)    Each Master shall be subject to the approval of Company as technically and commercially satisfactory for the manufacture and sale of phonograph records.

     (c)    You shall deliver the Masters to be produced hereunder no later than thirty (30) days after the date set forth above.

     (d)    Subject always to your representations and warranties hereunder, Artist hereby acknowledges that you have delivered to Artist and Company, on a timely basis, master tapes constituting technically and commercially satisfactory Masters and that such Masters have been accepted by Artist and Company.

3.    <u>Recording Procedure.</u>

    With respect to each Master produced hereunder, you shall cause Producer to:

     (a)    Produce, record, mix and edit each such Master.

     (b)    Perform such other services in connection with the Masters as are customarily performed by producers in the recording industry, including, without limitation, engaging musicians, vocalists, conductors, contractors, arrangers and copyists, and arranging for the use of recording studios and other necessary technical facilities and personnel.

     (c)    Deliver to Company fully edited and leadered stereophonic master recordings technically and commercially satisfactory to Company for the manufacture and sale of phonograph records. Upon Company's request and at Company's expense, you shall re-record, re-mix (but not specialty re-mixes), and/or re-edit any master recording until a Master satisfactory to Company has been obtained. Upon Company's request, you shall deliver to Company versions of such Master which are edited for use on singles. All original session tapes and any derivatives, duplicates or reproductions thereof shall also be delivered to Company, or to any other location designated by Company.

     (d)    Maintain and submit job sheets and deliver to Company within forty-eight (48) hours after each recording session hereunder, properly completed session reports, and all other documents, information and other materials, if any, (including but not limited to Form B's and W-4 and similar withholding forms) required by Company in order to make payment when due of union scale compensation, or in order to effect timely compliance with any other obligations under any applicable agreement with any union or labor organization in connection with the Master. You shall pay or reimburse Company, upon demand, for any penalties, fines, late charges or other costs incurred solely by reason of your failure to properly and timely comply with the foregoing; and any such sums paid by Company and not promptly reimbursed by you may, at Company's option and without limiting Company's rights, be applied by Company in reduction of any royalties (excluding mechanical royalties) or other sums, if any, payable to you

- 3 -

under this Agreement. You shall also deliver to Company as part of your delivery obligations hereunder a list of all featured vocal performers, background vocal performers and instrumental performers engaged by Producer or within Producer's control on the Masters, identifying their performances.

    (e)    Deliver to Company all necessary licenses, approvals, consents and permissions (excluding any side artist approvals). Your submission of the Masters to Company shall constitute your representation that you have obtained all such material.

    (f)    Comply with the Immigration Reform and Control Act of 1986 ("IRCA") and all other statutes, rules and regulations of the United States and any applicable state jurisdiction regarding the performances of services by non-citizens of the United States including, without limitation, the following procedures:

    (i)    Before any person furnished by you or Producer renders services in connection with the recording of the Masters hereunder (including, without limitation, each background and/or foreground instrumentalist, background and/or foreground vocalist, producer, engineer, mixer and re-mixer):

    (A)    You or Producer will require and in fact cause each such person to complete and sign the EMPLOYEE INFORMATION AND VERIFICATION ("Employee Section") of a United States Immigration and Naturalization Service Employment Eligibility Certificate Naturalization Service Employment Eligibility Certificate ("Form 1-9"), unless you or Producer shall already have obtained (and retained) a completed Form 1-9 from that person within the three (3) year period immediately preceding the date of the applicable recording session;

    (B)    You or Producer will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("Employer Section") of each such Form 1-9; and

    (C)    You or Producer will attach full and complete copies of the documents examined establishing identity and employment eligibility in accordance with the instructions in the Employer Section of Form 1-9.

    (ii)    You and Producer shall not permit any person furnished by you or Producer who fails to complete the Employee Section of a Form 1-9 (or who fails to furnish Producer with required documentation of identity and employment eligibility) to render any services in connection with the recording of the Master pursuant to this Agreement.

    (iii)    You or Producer shall deliver all duly completed Form 1-9s (with copies of the identity and eligibility documents attached) to Company within seventy-two (72) hours after the conclusion of the applicable recording session.

- 4 -

(iv)     You and Producer shall comply with any revised or additional verification and documentation procedures required by the United States Department of Immigration and Naturalization (the "INS") (or any other person with jurisdiction over non-citizens who perform services in the United States) in the future.

(v)     Notwithstanding the generality of the above, in the event that the INS agrees to recognize methods of compliance with IRCA which may be performed in lieu of the procedures enumerated above, such as, for example, the registration and identification card system administered by the Recording Industry Association of America (the "RIAA"), you or Producer may comply with such alternative methods in performing the obligations set forth above.

(g)     Neither you nor Producer shall enter into any agreements on behalf of Company or incur, directly or indirectly, any liability or expense of any kind for which Company may be held liable, in connection with any recording session hereunder or otherwise, without having first obtained Company's prior written approval as to the nature, extent and limit thereof, except with respect to the payment of items identified in the approved budget, provided that the amount of such payment does not exceed the amount budgeted for such item.

4.     Recording Costs; Recoupment.

(a)     You shall prepare and submit for Company's approval a recording budget pursuant to which you, on behalf of Company, shall engage the services of all personnel required in connection with the recording of the Masters to be produced hereunder. All Recording Costs shall be paid by Company (subject, however, to the provisions of paragraph 4(b) applicable in the event that such Recording Costs exceed the approved budget).

(b)     You will deliver to Company copies of substantiating invoices, receipts, vouchers and similar satisfactory documentary evidence of Recording Costs, and if you fail to do so, Company's obligations to pay such costs will be suspended until delivery thereof. To the extent that the Recording Costs in connection with the Masters produced hereunder exceed the recording budget therefor, you shall be solely responsible for payment of such excess costs, if such excess costs are solely caused by your acts or omissions. Nothing contained in this Agreement shall obligate Company to permit the continuation of any recording session or project if Company reasonably anticipates that the recording costs will exceed those specified in the approved budget or that the Master being recorded will not be technically and commercially satisfactory. In the event that Company, in its sole discretion, pays any such excess costs caused directly by Producer's acts or omissions, such excess costs may, at Company's option and without limiting Company's rights, be applied by Company in reduction of any royalties (excluding mechanical royalties) or other sums, if any, payable to you under this Agreement.. Moreover, Company shall have no obligation to pay (i) any Recording Costs with respect to the

- 5 -

Masters which is not recorded in accordance with all of the material terms and conditions of this Agreement, (ii) any recording fees or arranging fees which exceed union scale (unless such excess and the proposed recipient thereof are specified in the proposed budget and approved by Company), and (iii) any penalties, fines, late charges or other costs incurred for late payment of Recording Costs solely caused by your acts or omissions. In the event that Company pays any costs or fees described in the preceding sentence, you shall be deemed responsible for such costs or fees so paid by Company will be applied by Company in reduction of any royalties (excluding mechanical royalties) or other sums payable to you under this Agreement. Without limiting any of Company's rights or remedies, or any of your representations, warranties, obligations or agreements herein, Company acknowledges that there are no excess costs for which Producer is responsible.

(c)     Notwithstanding anything to the contrary contained in this Agreement, it is specifically understood and agreed that no royalties (excluding mechanical royalties) shall be payable to you hereunder unless and until Company has recouped all Recording Costs (excluding in-pocket producer and artist advances) incurred in connection with all master recordings in connection with the Album (including the Masters) from the "net artist" royalties (i.e., those royalties payable by Distributor to Company for each such master recording, excluding the royalties payable to all producers, mixers, etc. including Producer in connection with the Album) payable to Company by Distributor in respect of all such master recordings recorded in respect of such Album. After recoupment of such Recording Costs (excluding the producer advance and so-called "artist" advances) in accordance with the preceding sentence, royalties shall be payable to you hereunder for all records sold for which royalties are payable, retroactively from the first such record sold, subject to recoupment from such royalties of all advances paid to you hereunder. Notwithstanding the foregoing, if the terms regarding the recoupment of Recording Costs provided in this paragraph 4(c) are less favorable then the terms applicable to any other producer on the Album, then the more favorable terms will replace the terms set forth herein.

5.     Royalties.

In consideration of the rights granted to Company and all services rendered by you and Producer in connection with the Masters, and conditioned upon your and Producer's full performance of all of the material terms and conditions of this Agreement, Company shall accrue to your account a royalty as follows:

(a)     A royalty of four percent (4 %) of the Royalty Base for Net Sales through Normal Retail Channels in the United States ("USNRC Net Sales") of Albums.

(b)     The royalty payable to you for sales of records outside the United States, singles, digital uses, budget records, club sales and all other sales or uses of the Master produced hereunder shall be reduced and prorated in the same proportion that Company's base royalty rate with respect to net sales of Albums which embody the Masters through normal retail channels in

- 6 -

the particular territory is reduced and prorated; provided that with respect to sales or uses of the Master for which Company receives a royalty which is computed as a percentage of Distributor's net receipts, net monies, or the like, your royalty hereunder in respect of such sale or use shall be equal to Company's royalty therefore multiplied by a fraction, the numerator of which is equal to your applicable basic royalty rate as set forth in paragraph 5(a) above, and the denominator of which is equal to Company's "all-in" basic royalty rate for net sales of the Album through normal retail channels in the United States as set forth in the Recording Agreement.

(c) (i) All royalties payable to you hereunder shall be computed, determined, calculated and paid (but not escalated) in the same manner (e.g., container charges, free goods, suggested retail list price, reserves, compact disc and other format based adjustments, etc.) as royalties payable to Company by Distributor are computed, determined, calculated and paid pursuant to the Recording Agreement.

(ii) With respect to audiovisual recordings ("Videos") embodying the Masters produced hereunder, your royalty shall be an amount equal to fifty (50%) percent of the amount determined by multiplying Company's royalty for such Video by a fraction, the numerator of which is equal to your basic royalty rate pursuant to paragraph 5(a) above and the denominator of which is equal to Company's basic royalty rate for net sales of the Album in the United States, and to the extent the Video includes masters or other material which is not produced hereunder, your royalty shall be pro- rated as provided in paragraph 5(d) below. Notwithstanding anything to the contrary contained herein, you shall not be credited with any royalty in respect of a Video unless and until all costs incurred in the production of such Video have been recouped from Company's royalty therefor and following such recoupment your royalty for such Video shall be credited to your account on a prospective basis only. Company shall use its best efforts to cause Distributor to provide statements to Producer of Video royalties as set forth in paragraph 6 below.

(d) As to records (including the Album) not consisting entirely of the Masters produced hereunder, the royalty rate otherwise payable to you hereunder with respect to sales of any such record shall be pro-rated by multiplying such royalty rate by a fraction, the numerator of which is the number of Masters produced hereunder embodied on such record and the denominator of which is the total number of royalty-bearing masters (including the Masters) embodied thereon.

(e) In the event either Master is produced by you with another producer engaged by you to whom Company shall be obligated to pay a royalty, then the royalty payable to you hereunder with respect to such Master shall be reduced by the royalty payable by Company to such other producer(s) or individual(s). In the event a third party is engaged by Company to produce, co-produce, edit, mix or remix any Master or perform additional services with respect to the Masters produced hereunder, then the royalty payable to you hereunder with respect to such Master shall not be reduced by more than one percent (1%).

- 7 -

(f)      In the event that Artist receives or is credited with any so-called "Direct Monies" (specifically excluding so-called publishing monies) from third-parties other than Company (i.e., monies from Sound Exchange) solely attributable to a Master, Company will cause Artist to pay you your pro-rata share of such Direct Monies determined by multiplying such Direct Monies, received by Artist, by a fraction, the numerator of which is the Producer basic royalty rate and the denominator of which is the Artist's basic royalty rate. Company will use reasonable efforts to cause Artist to instruct Sound Exchange to pay to you by way of a letter of direction your applicable pro-rata share of such Sound Exchange monies, provided that Company's inadvertent failure to comply with the foregoing shall not be deemed a breach of this Agreement.

6.      <u>Accountings.</u>

(a)      Company shall cause Distributor to account directly to you at the same time Distributor accounts to Company via a letter of direction attached hereto as Exhibit "A". Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made  on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as Distributor may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by you during such preceding half-year, less Advances or other recoupable and/or deductible amounts hereunder. Distributor shall have the right to hold reserves in respect of sales hereunder in an amount equal to the reserves established for Company, or, if any Master produced hereunder is embodied on a Soundtrack, compilation or similar album, equal to the reserves established for the primary rights grantor.  Notwithstanding the foregoing, if Distributor fails to account directly to you, then Company shall account to you within thirty (30) days of Company's receipt from Distributor of the statement and payment, if any. In so accounting to you, Company shall have the right to rely on the statements rendered to Company by Distributor.

(b)      Intentionally Omitted.

(c)      Royalties in connection with the exploitation of the Master hereunder shall be computed in the same national currency as Distributor is accounted to by its licensees and shall be paid at the same rate of exchange as Distributor is paid, and shall be subject to any taxes applicable to royalties remitted by or received from foreign sources, provided, however, that royalties on Records sold outside the United States shall not be due and payable by Company or Distributor until payment therefor has been received by Distributor in the United States in United States Dollars.  If Distributor shall not receive payment in the United States, or in United States Dollars, and shall be required to accept payment in a foreign country or in foreign currency, Distributor shall deposit to the credit of you (at your request and expense), in such currency in a depository of your choice in the country in which Distributor is required to accept payment, your share of royalties due and payable to you with respect to such sales.  Deposit as aforesaid shall

- 8 -

fulfill the obligations of Company and Distributor as to Record sales to which such royalty payments are applicable. If any law, government ruling or any other restriction affects the amount of the payments which Distributor's licensee can remit to Distributor, Distributor may deduct from your royalties an amount proportionate to the reduction in such licensee's remittances to Distributor.

(d)     All royalty statements rendered by Company or Distributor to you shall be binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to Company within one (1) year from the date actually rendered (provide that such period shall be no longer or shorter than three (3) months less than the period granted to Company in which to object to accountings pursuant to the Recording Agreement). Failure to make specific objection within said time period shall be deemed approval of such statement absent subsequent evidence of malfeasance.

(e)     You shall have the right at your own expense to audit Company's books and records only as the same pertain to the exploitation of the Masters under this agreement. You may make such an examination for a particular statement only once, and only within one (1) years after the date when Company or Distributor actually renders you said statement under paragraph 6(a) above (provided that such period shall be no longer or shorter than three (3) months less than the period granted to Company to examine Distributor's books and records pursuant to the Recording Agreement). Such audit shall be conducted during Company's usual business hours, and at Company's regular place of business in the United States where Company keeps the books and records to be examined on reasonable written notice. Such audit shall be conducted by an independent certified public accountant or attorney. No examination may be made of any manufacturing records or any other records that do not specifically report sales of other distribution of records.

(f)     You acknowledge that Company's books and records contain confidential trade information. Neither you nor your representatives shall at any time communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records, except as required by law or in a court of law.

(g)     You will not have the right to bring an action against Company in connection with any royalty accounting or payments hereunder unless you commence the suit within one (1) years from the date such statement of accounting for royalties or such payment was due (provided that such period shall be no longer or shorter than three (3) months less than the period granted to Company in which to sue the Distributor pursuant to the Recording Agreement). If you commence suit on any controversy or claim concerning royalty accountings rendered by Company or Distributor under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy

- 9 -

available to you by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this agreement or avoid the performance of your obligations under it by reason of any such claim.

7.     Advances.

        (a)      In consideration of your and Producer's services hereunder, Company shall pay to you the following: (a) a recoupable advance against royalties (but not inclusive of mechanical royalties) payable to you hereunder in the amount of Twenty Thousand Dollars ($20,000) per Master for one (1) Master for a total of Twenty Thousand Dollars ($20,000) (the "Producer Advance"); and (b) for one (1) Master, in lieu of an advance, Producer's services are rendered for good and valuable consideration in the form of Artist rendering a vocal performance in connection with a master recording featuring the performance of Producer ("Producer Master") to be included on Producer's forthcoming album entitled "The Greatest Story Ever Told".  The Producer Advance shall be payable as follows: (a) one- half (1/2) payable upon commencement of recording of the Masters and (b) the balance promptly following the later of (i) delivery to and acceptance by Company of the Masters required to be delivered hereunder and (ii) the execution of this Agreement by all parties hereto. You hereby authorize and direct Company to pay the sum of One Thousand Dollars ($1,000) of the Producer Advance to Mark Music and Media Law, P.C., 1900 Avenue of the Stars, 25th Floor, Los Angeles, CA 90067, for Producer's attorney's fees. You hereby acknowledge that Company's compliance with your request to direct Distributor to make the foregoing payment shall not constitute Mark Music and Media Law, P.C. as a beneficiary of or a party to this agreement. Such payment shall constitute a payment to you, and neither Company nor Distributor shall have any liability by reason of any erroneous payment we may make or failure to comply with this authorization. You will indemnify and hold Company and Distributor harmless against any claims asserted against Company or Distributor and any damages, losses or expenses incurred by Company or Distributor by reason of any such payment or otherwise in connection herewith. Distributor's failure to comply with our instruction shall not be deemed a breach of this agreement.

        (b)      All amounts paid to you pursuant to paragraph 7(a) hereof (i.e., the Producer Advance), as well as all monies paid by Company to you or on your or Producer's behalf, during the Term of this Agreement (other than royalties paid pursuant to Paragraph 5 and 9 hereof), shall constitute advances hereunder and shall be recoupable from any royalties (excluding mechanical royalties) payable to you hereunder.

8.     Restrictions.

        (a)      Neither you nor Producer shall enter into any agreement or make any commitments which would interfere with your or Producer's performance of any of the terms and provisions hereof.

- 10 -

(b)     Neither you nor Producer shall produce any selection or portion thereof produced hereunder for the purpose of making records for any person or entity other than Company for a period of four (4) years after the date of delivery by you of the Master embodying such selection. In the event that you or Producer violate the foregoing restriction, Company may, in addition to any other right or remedy which it may have on account of such breach, terminate its obligation to pay you any further royalties hereunder with respect to the exploitation of records containing the Master as to which the restriction was violated.

9.     Mechanical Licenses.

(a)     The compositions recorded hereunder which are written, owned or controlled, in whole or in part, by you, Producer or any entity owned or controlled by, or affiliated with, you or Producer ("Controlled Compositions") are hereby licensed to Company for the United States at a rate (the "Controlled Composition Rate") equal to one hundred percent (100%) of the minimum statutory copyright royalty rate in effect as of the date the corresponding Master was delivered, and shall be subject to the so-called "song cap" set forth in the Recording Agreement; and for Canada at a rate equal to one hundred percent (100%) of the minimum compulsory rate in Canada as of the date the corresponding Master was initially recorded, and shall be subject to the song cap in the Recording Agreement (or if there is no such rate, then one hundred percent (100%) of the current rate consistent with CMRRA in Canada on a general basis). Mechanical royalties shall only be payable on records for which royalties are payable hereunder.  Otherwise, mechanical royalties shall be paid, computed, reduced and accounted for upon the terms and conditions set forth in the Recording Agreement applicable to Controlled Compositions thereunder, including without limitation, reduced mechanical royalty rates payable in respect of such Controlled Compositions; records for which mechanical royalties are payable, reserves, synchronization and other uses, etc.

(b)     You and Producer hereby acknowledge on behalf of yourself, Producer, and Producer's publishing designee that Producer controls the following percentage in and to the underlying compositions (prior to any conveyance of copyright in connection with any so-called "interpolations" or "samples") embodied in the following Masters:

|  |  |
|---|---|
| "La" | 50% |
| "Pussy Monster" | 50% |

(c)     If any compositions are recorded which are not Controlled Compositions, you warrant and represent that Company shall be able to obtain mechanical licenses therefor for the United States at rates and on terms no less favorable to Company than those contained in the then-current standard license form then being utilized by The Harry Fox Agency, Inc.

- 11 -

(d)     Company is hereby granted a royalty-free license to reproduce Controlled Compositions which are embodied on the Masters produced hereunder in synchronization with and in time relation to visual images featuring Artist's performances in so-called promotional only "video programs." You agree to negotiate in good faith with Company regarding a fee for use of Controlled Compositions in the commercial exploitation of Videos, provided, nothing shall prohibit the use by Company pending the successful conclusion of such negotiations.

10.     Company's Rights.

Each Master produced hereunder shall, from the inception of its creation, be considered a "work made for hire" (excluding the underlying musical composition) for Company within the meaning of the U.S. Copyright Law. If it is determined that a Master does not so qualify, then such Master, together with all rights in it (including the sound recording copyright but excluding the copyright in the underlying musical composition), shall be deemed transferred to Company by this Agreement. The Master (excluding the underlying musical composition) shall, from the inception of its creation, be entirely the property of Company in perpetuity, throughout the world, free of any claim whatsoever by you, Producer or by any persons deriving any rights or interests therefrom. Without limiting its rights, Company shall have the sole and exclusive right in perpetuity and throughout the territory:

(a)     To manufacture, advertise, sell, license or otherwise dispose of the Master and phonograph records derived therefrom upon such terms, and under such trademarks, as Company elects, or, in its sole discretion, to refrain therefrom;

(b)     To perform the Master publicly and to permit the public performance thereof by any method now or hereafter known; and

(c)     Company shall have the non-exclusive right to use and publish your approved and Producer's approved name (including all professional, group and assumed or fictitious names), approved photographs and approved biographical material in connection with the promotion, exploitation and sale of derivatives of the Master. Company will make available to you or Producer for your and/or Producer's approval, at Company's offices, any pictures of you and Producer or biographical material about you and Producer which it proposes to use as set forth in the pervious sentence. In the event Producer does not disapprove of the use of said pictures or biographical material within five (5) business days after notifying you or Producer of such intended use, it will be deemed that said pictures or biographical material has been so approved. This paragraph will not apply to any material previously approved by Producer. No inadvertent non-repetitive failure to comply with this paragraph will constitute a breach of this Agreement, provided that Company shall use its reasonable efforts to cure any such failure prospectively.

- 12 -

11.    <u>Representations and Warranties.</u>

You represent, warrant, covenant and agree as follows:

(a)     You and Producer are free to enter into and perform this Agreement with Company, and are not and will not be under any disability, restriction or prohibition, contractual or otherwise, with respect to (i) your and Producer's right to execute this Agreement, (ii) your and Producer's right to grant all of the rights granted to Company hereunder, and (iii) your and Producer's right to fully perform each and every term and provision hereof. You agree not to do or attempt to do, or suffer to be done, during or after the term hereof, any act in derogation of or inconsistent with Company's rights hereunder.

(b)     (1)     Solely to the extent of you and Producer's contributions, neither Master produced hereunder nor any of the contents thereof, nor the manufacture or sale of records made from such Master, nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by you or Producer and embodied or contained in or used in connection with the Masters or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy. Without limiting the generality of the foregoing, you specifically represent and warrant that no selections recorded or to be recorded hereunder are subject to any re-recording restriction under any previous recording contract to which you or Producer may have been a party. Neither you nor Producer nor any person rendering services in connection with the Master recorded hereunder is or will be a party to any contract which would in any way impair the rights granted to Company hereunder.

(2)     Solely to the extent of Company's and Artist's contributions and those of any parties furnished or engaged by Company or Artist, neither the Masters produced hereunder nor any of the contents thereof, not the manufacture or sale of records made from such Masters, nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by Company or Artist and embodied or contained in or used in connection with the Masters or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy. Without limiting the generality of the foregoing, Company specifically represents and warrants that no selections recorded or to be recorded hereunder are subject to any re-recording restriction under any previous recording contract to which Company may have been a party. Neither Company nor Artist nor any person furnished by Company or Artist rendering services in connection with the Masters recorded hereunder is or will be a party to any contract which would in any way impair the rights granted to you hereunder.

- 13 -

(c)     Solely to the extent of you and Producer's contributions, each Master delivered hereunder shall be free of all liens and encumbrances, and there shall be no claims, demands or actions of any nature pending, threatened in writing or known to you or Producer with respect thereto which are not released prior to the delivery of the Master involved.

(d)     The Masters produced pursuant to this Agreement shall be produced under and in conformity with any union agreements to which the Master may at any time be or become subject.

(e)     All of your and Producer's representations and warranties shall be true and correct upon execution hereof and upon delivery of each Master hereunder, and shall remain in effect for so long as Company and its licensees, assignees, transferees or successors in interest have any rights in or to the Master. Company's acceptance of the Masters or other materials hereunder shall not constitute a waiver of any of your or Producer's representations, warranties or agreements in respect thereof.

(f)     Company shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to Company hereunder, except as specifically provided in this Agreement. You will pay all royalties or other compensation (whether in lieu of royalties or otherwise) becoming due to Producer or to any persons engaged by you who perform or in any way contributed to the recording and/or production of the Masters delivered hereunder (other than Artist, side artists, other producers engaged by Company, or other persons engaged by Company).

12.     Samples.

(a)     In rendering services hereunder, you will not "sample" or otherwise incorporate into the Masters (for convenience "Sample" or "Sampling" herein) or permit any other party, excluding Artist and Company, to Sample any copyrighted or otherwise proprietary material ("Proprietary Material") belonging to any other person other than the Company (such party herein referred to as "Owner(s)") without: (1) having notified Company of the Proprietary Material that you or your agent intend to use and the identity of the Owner(s) thereof; (2) obtained Company's prior written approval of such intended use; (3) secured from the applicable Owners, at your sole expense, a written agreement, in a form satisfactory to Company, that Company shall have the perpetual right to use such Proprietary Material in the Master and to use or otherwise distribute or exploit the Master containing such Proprietary Material for all record purposes and for use in music videos, in perpetuity, all either without any payment whatsoever to Owner(s) or upon payment to Owner(s) of a payment approved by Company (the "Clearance Effort"). Company shall have no obligation to approve or to make any such payment, and Company's approval or any such payment shall not constitute a waiver of any of Company's rights or remedies. In the event that the Master contains Proprietary Material other than disclosed ("Undisclosed Samples"), and if you have not obtained and delivered to Company all licenses,

- 14 -

permissions or other authorizations required hereunder, then the Master will be deemed to be not satisfactory for the manufacture and sale of phonograph records, regardless of the date that Company becomes aware of the existence of such Proprietary Material, and Company reserves the right to reject Delivery of the Master notwithstanding the distribution or previous acceptance of the Master. Solely to the extent of your and Producer's contributions, you and Producer warrant and represent that the Master hereunder shall not contain any Proprietary Material which has not been licensed so as to allow Artist and his licensees to distribute the Master as fully contemplated in this Agreement.  In the event Company makes any payment which you are otherwise responsible for with respect to any Sample, then, without limiting Company's rights and remedies, Company shall have the right to demand reimbursement therefor from you and/or to deduct the entire amount of such payment from any and all monies otherwise payable to you hereunder.

(b)     Notwithstanding anything to the contrary contained herein, Company and/or Distributor may, at its sole election and solely as an accommodation to you, undertake control of all of the Clearance Efforts hereunder. You acknowledge and agree that any payments made by Company and/or Distributor in connection with the Clearance Efforts shall, without limitation of Company's other rights and remedies, at Company's and/or Distributor's election, be treated as Recording Costs within the approved budget.

(c)     For the avoidance of doubt, any third-party publishing conveyances in the new composition (i.e., the newly-created composition underlying the Master) resulting from any such Proprietary Material furnished by Producer shall reduce Producer's, not Artist's, publishing interest in the Master.

(d)     Solely to the extent of your contributions, you and Producer warrant and represent that there is no Proprietary Material included in the Masters.

13.     Indemnification.

(a)     You hereby agree to indemnify and hold Company, Artist and our respective successors, assigns, agents, distributors, licensees, past and present officers, directors and employees (the "Indemnitees") harmless against any third party claim, liability, cost and expense (including reasonable outside attorneys' fees and actual out-of-pocket legal costs) in connection with any claim which is inconsistent with any agreement, covenant, representation, or warranty made by you in this Agreement which has resulted in a final adverse judgment in a court of competent jurisdiction or settled with your consent. You will reimburse the Indemnitees upon demand for any payment made by them at any time after the date hereof (including after the term of this Agreement) in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Upon the making or filing of any such claim, action or demand, the Indemnitees shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue. You shall be notified of any

- 15 -

such claim, action or demand and shall have the right, at your own expense, to participate in the defense thereof with counsel of your own choosing; provided, however, that the Indemnitees' decision in connection with the defense of any such claim, action or demand shall be final. The Indemnitees will release monies held pursuant to this paragraph if you make bonding arrangements, satisfactory to the Indemnitees in their sole reasonable discretion, to assure the Indemnitees of reimbursement of the amount of your potential liability under this paragraph. If no action has been filed within one (1) year following the date of notice of such claim, Company shall release all such sums withheld in connection with such claim, subject to Company's rights to again withhold such monies if any such claim is reasserted.

(b)     Company agrees to indemnify and hold you, Producer and your respective successors, assigns, agents, distributors, licensees, past and present officers, directors and employees (the "Indemnitees") harmless against any third party claim, liability, cost and expense (including reasonable outside attorneys' fees and actual out-of-pocket legal costs) in connection with any claim which is inconsistent with any agreement, covenant, representation, or warranty made by Company in this Agreement which has resulted in a final adverse judgment in court of competent jurisdiction or settled with Company's written consent. Company will reimburse the Indemnitees upon demand for any payment made by them at any time after the date hereof (including after the term of this Agreement) in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Company shall be notified of any such claim, action or demand and shall have the right, at Company's own expense, to control the defense thereof.

14.     Force Majeure.

Company reserves the right by written notice to you to suspend the operation of this Agreement and its obligations hereunder for the duration of any contingencies by reason of which Company is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable: for example, labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond Artist's control.

15.     Suspension and Termination.

If at any time you or Producer fail to fulfill any of your or Producer's obligations herein, then, without limiting Company's rights, Company shall have the option, exercisable at any time by notice to you, (i) to suspend Company's obligations to you hereunder during the period of default and/or (ii) to terminate this Agreement without any further obligation to you hereunder.

16.     Credit.

Provided that you have fulfilled all of your material services hereunder, Company shall use its best efforts to cause Distributor to accord you and Producer an appropriate credit on labels

- 16 -

of records and the line notes, sleeves and J-cards of Albums which embody the Master as follows: "Produced by David Banner" Company shall use his best efforts to cause Distributor to accord you such credit in all one-fourth (1/4) page or larger trade and consumer advertisements (including so called "Billboard Strip-ads") relating solely to the Master which are placed by or under Company's and/or Distributor's control and subject to Distributor's policy with respect thereto in the United States. Distributor's non-repetitive inadvertent failure to comply with the foregoing shall not be deemed to be a breach of this Agreement, provided that upon receipt of notice from you that you have not been accorded credit as set forth in this paragraph, Company shall use reasonable efforts to correct such failure on a prospective basis. The failure of any licensee of Company to comply with the aforesaid provisions shall not be deemed a breach hereof.

17.     Failure of Performance.

The failure by either party to perform any of its obligations hereunder shall not be deemed a breach of this Agreement unless a party gives the other party written notice of such failure to perform and such failure is not corrected within thirty (30) days (fifteen (15) days in the case of non-payment) from and after receipt of such notice.

18.     Legal and Equitable Relief.

You acknowledge that your and Producer's services hereunder, as well as the Masters recorded and the rights and privileges granted to Company under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by you or Producer of any material term, condition, representation, warranty or covenant contained herein, Company will be caused irreparable injury and damage. You expressly agree that Company shall be entitled to seek remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, Company may have.

19.     Notices.

(a)     All notices to be given by either party hereunder shall be in writing and shall be delivered by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given. Royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail. Copies of all notices to Artist shall be sent to Law Offices of Ronald E. Sweeney, 222 Riverside Drive, PH5A, New York, NY 10025, Attention: Ronald E. Sweeney, Esq.

20.     Definitions.

- 17 -

For purposes of this agreement, unless specifically defined herein, the definitions set forth in the Recording Agreement shall apply, a copy of which is attached hereto as Exhibit "A" and incorporated herein by this reference.

21.   Miscellaneous.

(a)    The terms set forth in this Agreement and all exhibits and attachments hereto, constitute the entire understanding between Company and you with respect to the subject matter hereof, all prior and/or contemporaneous negotiations and understandings being merged herein. This Agreement cannot be canceled, modified, amended or waived, in part or in full, in any way except by an instrument in writing signed by the party to be charged. No waiver by Company or you whether express or implied; of any provision of this Agreement or any default hereunder shall affect the other's right to thereafter enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. Those provisions of any applicable collective bargaining agreement between Company and any labor organization which are required, by the terms of such agreement to be included in this agreement shall be deemed incorporated herein. This Agreement shall be governed by and construed under the laws and judicial decisions of the State of New York without giving effect to the conflict of laws principles of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the United States District Courts located in New York County; provided, however, if Company is sued or joined in any other court or forum in respect of any matter which may give rise to a claim by Company hereunder, you and Producer consent to the jurisdiction of such court or forum over any such claim which may be asserted by Company. Should any paragraph or provision of this Agreement be held to be void, invalid or inoperative, such decision shall not affect any other paragraph or provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative paragraph or provision had not been contained herein.

- 18 -

(b)    You and Producer hereby warrant and represent that you have read and fully understand this Agreement; that Company has advised you of your right to seek and obtain the advice of independent legal counsel in connection with the negotiation and execution of this Agreement and your rights and obligations hereunder; that you have either obtained such legal counsel or knowingly and voluntarily waived the right to such legal counsel without any coercion or other influence from Company or Company's representatives; and that you desire to enter into this Agreement without the benefit of legal counsel.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

YOUNG MONEY ENTERTAINMENT, LLC

By: _____
        An Authorized Signatory


AGREED AND ACCEPTED:

B.I.G.F.A.C.E. ENTERTAINMENT, INC.


By: _____
        An Authorized Signatory

- 19 -

INDUCEMENT AND GUARANTEE:

      The undersigned hereby acknowledges that they have read and are familiar with all the terms and conditions of the foregoing Agreement; assent to the execution of the Agreement, and agree to be bound by the terms and conditions thereof, including but not limited to each and every provision of the Agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Agreement, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the Agreement by the undersigned and by b.I.G.F.A.C.E. Entertainment, Inc.

_____

Levell Crump p/k/a "David Banner"

- 20 -

<u>LETTER OF DIRECTION</u>

Dated as of February 8, 2008

Cash Money Records, Inc.
2800 Veterans Blvd., Suite 216
Metarie, LA 70002

*Re:   **b.I.G.f.a.c.e. Entertainment, Inc f/s/o Levell Crump p/k/a "David Banner" –w- Young Money Entertainment, LLC f/s/o Dwayne Carter p/k/a "Lil Wayne"/Producer Agreement***

Gentlemen:

1.      The undersigned has engaged b.I.G.f.a.c.e. Entertainment, Inc. f/s/o Levell Crump p/k/a "David Banner" (the "Producer") to produce two (2) master recordings (the "Master Recording(s)"), entitled "La," and "Pussy Monster" for possible inclusion on the forthcoming album entitled "Carter III" (the "Album") which will be delivered by the undersigned pursuant to the agreement between you and the undersigned dated as of November 1, 1998, as amended and in full force as of the date hereof (the "Agreement").

2.      Although the Agreement requires the undersigned to pay for the services of the Producer, the undersigned hereby requests and irrevocably authorizes you to make payments for the Producer's services on the undersigned's behalf, as follows:

        (a)      An advance (the "Producer Advance") of Twenty Thousand Dollars ($20,000) for the Master Recordings. Notwithstanding the foregoing, we hereby instruct you to direct the sum of One Thousand Dollars ($1,000) of the Producer Advance to Mark Music and Media Law, P.C., 1900 Avenue of the Stars, 25th Floor, Los Angeles, CA 90067, as payment for Producer's attorney's fees. The Producer Advance will be recoupable by you from all royalties (excluding mechanical royalties) becoming payable to Producer or for Producer's services under paragraph 2(b) below or otherwise.  To the extent not so recouped, the Producer Advance may be recouped by you from any monies becoming payable to the undersigned, but all amounts so recouped from monies payable to the undersigned will be credited to the undersigned's royalty account if subsequently recouped from monies payable to the Producer.  Each such Producer Advance will also be applied against the recording budget applicable to the Recordings under the Agreement.

- 21 -

(b)   (i)   A royalty (the "Producing Royalty") with respect to the Master Recordings on net sales of all Phonograph Records, computed and paid in the same manner as the royalty payable to the undersigned under the Agreement, at the same times, and subject to the same conditions, but at the basic rate of four percent (4%) instead of the rate fixed in the Agreement with proportionate reductions on all sales for which reduced royalties are payable under the Agreement.  The amount of the Producing Royalty will be deducted from all monies payable or becoming payable to the undersigned under the Agreement.

(ii)   As to records (including the Album) not consisting entirely of the Masters produced hereunder, the Producing Royalty otherwise payable hereunder with respect to sales of any such record shall be pro-rated by multiplying such royalty rate by a fraction, the numerator of which is the number of Masters produced hereunder embodied on such record and the denominator of which is the total number of royalty-bearing masters (including the Masters) embodied thereon.

(iii)   In the event the Master is produced by Producer with another producer engaged by Producer to whom you shall be obligated to pay a royalty, then the royalty payable to Producer hereunder with respect to such Master shall be reduced by the royalty payable by you to such other producer(s) or individual(s). In the event a third party is engaged by Company to produce, co-produce, edit, mix or remix any Master or perform additional services with respect to the Master produced hereunder, then the royalty payable to Producer hereunder with respect to such Master shall not be reduced by more than one percent (1%).

(iv)   The Producing Royalty will not be payable until you have recouped all Recording Costs attributable to the Recordings for the Album under the Agreement. After recoupment of such Recording Costs (excluding the producer advance and so-called "artist" advances) in accordance with the preceding sentence, the Producing Royalty will be computed retroactively and paid on all such Records from the first Record sold, subject to recoupment from such royalties of the Producer Advance.  Such recoupment will be computed at the undersigned's net royalty rate as reduced to reflect the deduction of the Producing Royalty.

3.   Your compliance with this authorization will constitute an accommodation to the undersigned alone; the Producer is not a beneficiary of it.  All payments to the Producer under this authorization will constitute payment to the undersigned and you will have no liability by reason of any erroneous payment or failure to comply with this authorization.  The undersigned will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses you incur by reason of any such payment or otherwise in connection herewith.

4.   All monies becoming payable under this authorization will be remitted to the Producer at the following address or otherwise as the Producer directs you in writing: and will be accompanied by statements with respect to those payments.  (The undersigned understands that

- 22 -

royalty payment instructions of this nature are usually placed in effect with respect to the accounting period in which you receive them if they are delivered to you within the first three (3) months of that period, and with respect to the next accounting period if delivered after that time, although administrative factors may result in variations from that procedure.)

b.I.G.f.a.c.e Entertainment, Inc.

f/s/o Levell Crump p/k/a "David Banner"

c/o Mark Music and Media Law, PC

1900 Avenue of the Stars, 25th Floor

Los Angeles, CA 90067

Attention: Douglas Mark

5.      Each Master Recording produced by the Producer shall be considered a "work made for hire" for you.  All such Recordings and the performances contained thereon (excluding the underlying musical composition) and Recordings derived therefrom shall from inception of their creation be entirely your property in perpetuity throughout the world, under copyright and otherwise, free of any claim whatsoever by the undersigned and/or the Producer and/or any third party, and you shall have the right to register the copyrights in such Master Recordings in your name or in the name of your designee(s) and to secure any and all renewals and extensions thereof.  Without limiting the generality of the foregoing, the Producer and the undersigned hereby assign to you all of our right and title to the copyrights (excluding the underlying musical composition) in perpetuity throughout the world in and to the Master Recordings, Recordings derived therefrom and any and all renewals and extensions of such copyrights.

Very truly yours,

YOUNG MONEY ENTERTAINMENT, LLC.

By: _____
       An Authorized Signatory

Exhibit B

PRODUCER AGREEMENT

AGREEMENT made and entered into as of this 11th day of December, 2009, by and between Young Money Entertainment, LLC ("Company"), c/o Law Offices of Ronald E. Sweeney, 1790 Broadway, 10th Floor, New York, NY 10019 and b.i.G. f.a.c.e. Entertainment, Inc. ("you") f/s/o Lavell Crump p/k/a "David Banner" ("Producer"), c/o Davis Shapiro Lewit & Hayes, LLP, 689 Fifth Avenue, 5th Floor, New York, New York 10022, Attn: Damien Granderson, Esq.

The parties hereby agree as follows:

1.    Employment and Term.

(a)    Company hereby engages you to furnish the non-exclusive personal services of Producer to produce one (1) master recordings entitled "Streets is Watchin" (the "Master(s)") for possible inclusion of the forthcoming Company album entitled "We Are Young Money" ("Album") embodying the performances of artists under contract with Company ("Artist") to be delivered by Company to Cash Money Records ("Distributor"). You accept such engagement and agree to cause Producer to render such production services for Company during the Term hereof upon the terms and conditions hereinafter set forth. In the event the number of master recordings produced hereunder is no more than one (1), then all references to "Masters" hereunder shall be read and deemed to refer to one (1) "Master."

(b)    The term of this Agreement shall commence upon the date hereof and shall continue until you and Producer have fulfilled all of your material obligations hereunder (the "Term"). Without limiting any of Company's rights or remedies or any of your representations, warranties, obligations or agreements herein, Company hereby acknowledges satisfactory completion of Producer's services.

2.    Services.

(a)    The times and places of all recording sessions produced hereunder, the selections to be recorded at such recording sessions, the accompanying artists (vocal and instrumental) to perform at such recording sessions and the other creative and technical personnel to be utilized shall be mutually designated by you and Company. Company shall have the right and opportunity, at its own non-recoupable expense, to have its representatives attend each recording and mixing session.

(b)    With respect to the Master produced hereunder, and unless Company otherwise agrees in writing:

(i)    Each Master shall embody the studio performance by Artist of a selection approved by Company and not previously recorded by Artist, shall be recorded in a first-class recording studio, and shall not embody any so-called "live" performances of Artist.

- 2 -

(ii)    Each Master shall be subject to the approval of Company as technically and commercially satisfactory for the manufacture and sale of phonograph records.

(c)    You shall deliver the Masters to be produced hereunder no later than thirty (30) days after the date set forth above.

(d)    Subject always to your representations and warranties hereunder, Company hereby acknowledges that you have delivered to Company, on a timely basis, master tapes constituting a technically and commercially satisfactory Master and that such Master has been accepted by Company.

3.    Recording Procedure.

With respect to each Master produced hereunder, you shall cause Producer to:

(a)    Produce, record, mix and edit each such Master.

(b)    Perform such other services in connection with each such Master as are customarily performed by producers in the recording industry, including, without limitation, engaging musicians, vocalists, conductors, contractors, arrangers and copyists, and arranging for the use of recording studios and other necessary technical facilities and personnel.

(c)    Deliver to Company fully edited and leadered stereophonic master recordings technically and commercially satisfactory to Company for the manufacture and sale of phonograph records. Upon Company's reasonable, written request, you shall re-record, re-mix (but not specialty re-mixes), and/or re-edit any master recording until a Master satisfactory to Company has been obtained. Upon Company's reasonable, written request, you shall deliver to Company versions of such Master which are edited for use on singles. All original session tapes and any derivatives, duplicates or reproductions thereof shall also be delivered to Company, or to any other location designated by Company.

(d)    Maintain and submit job sheets and deliver to Company within seventy-two (72) hours after each recording session hereunder, properly completed session reports, and all other documents, information and other materials, if any, (including but not limited to Form B's and W-4 and similar withholding forms) reasonably required by Company in order to make payment when due of union scale compensation, or in order to effect timely compliance with any other obligations under any applicable agreement with any union or labor organization in connection with the Master. You shall pay or reimburse Company, upon demand, for any penalties, fines, late charges or other costs incurred solely by reason of your failure to properly and timely comply with the foregoing; and any such sums paid by Company and not promptly reimbursed by you may, at Company's option and without limiting Company's rights, be applied by

- 3 -

Company in reduction of any record royalties (excluding mechanical royalties) or other sums, if any payable to you under this Agreement.

      (e)    Deliver to Company all necessary licenses, approvals, consents and permissions (excluding any side artist approvals). Your submission of the Master to Company shall constitute your representation that you have obtained all such material.

      (f)    Comply with the Immigration Reform and Control Act of 1986 ("IRCA") and all other statutes, rules and regulations of the United States and any applicable state jurisdiction regarding the performances of services by non-citizens of the United States including, without limitation, the following procedures:

      (i)    Before any person renders services in connection with the recording of the Master hereunder (including, without limitation, each background and/or foreground instrumentalist, background and/or foreground vocalist, producer, engineer, mixer and re-mixer):

      (A)    You or Producer will require and in fact cause each such person furnished or engaged by you to complete and sign the EMPLOYEE INFORMATION AND VERIFICATION ("Employee Section") of a United States Immigration and Naturalization Service Employment Eligibility Certificate ("Form 1-9"), unless you or Producer shall already have obtained (and retained) a completed Form 1-9 from that person within the three (3) year period immediately preceding the date of the applicable recording session;

      (B)    You or Producer will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("Employer Section") of each such Form 1-9; and

      (C)    You or Producer will attach full and complete copies of the documents examined establishing identity and employment eligibility in accordance with the instructions in the Employer Section of Form 1-9.

      (ii)    You and Producer shall not permit any person who fails to complete the Employee Section of a Form 1-9 (or who fails to furnish Producer with required documentation of identity and employment eligibility) to render any services in connection with the recording of the Master pursuant to this Agreement.

      (iii)    You or Producer shall deliver all duly completed Form 1-9s (with copies of the identity and eligibility documents attached) to Company within seventy-two (72) hours after the conclusion of the applicable recording session.

      (iv)    You and Producer shall comply with any revised or additional verification and documentation procedures required by the United States Department of Immigration and

- 4 -

Naturalization (the "INS") (or any other person with jurisdiction over non-citizens who perform services in the United States) in the future.

(v)     Notwithstanding the generality of the above, in the event that the INS agrees to recognize methods of compliance with IRCA which may be performed in lieu of the procedures enumerated above, such as, for example, the registration and identification card system administered by the Recording Industry Association of America (the "RIAA"), you or Producer may comply with such alternative methods in performing the obligations set forth above.

(g)     Neither you nor Producer shall enter into any agreements on behalf of Company or incur, directly or indirectly, any liability or expense of any kind for which Company or Distributor may be held liable, in connection with any recording session hereunder or otherwise, without having first obtained Company's prior written approval as to the nature, extent and limit thereof, except with respect to the payment of items identified in the approved budget, provided that the amount of such payment does not exceed the amount budgeted for such item.

(h)     In the event that Company determines, in its sole discretion that the master produced hereunder needs to be remixed, Company shall afford Producer with the first opportunity to perform the first of such remixes of the Master (excluding any so called "specialty remixes"), subject to the following: (i) Company shall notify you of Company's intent to create such first remix of the Master and shall propose in good faith a budget in connection with such remix, (ii) if you do not notify Company in writing within three (3) business days after such notification is sent to you that Producer will complete the required remixing on the proposed terms set forth in such notice within ten (10) days after such notification is sent to you and/or if you fail to deliver such remixed Master within said ten (10) days period, then you shall be deemed to have waived such opportunity to remix and Company shall be free to engage any other person to perform such work. For the avoidance of doubt, Company shall not be obligated to use Producer's services as described herein other than for the first remix of the Master, and in no event shall the provisions of this paragraph 3(h) apply to any so-called "specialty remixes."

4.     Recording Costs; Recoupment.

(a)     You shall prepare and submit for Company's approval a recording budget pursuant to which you, on behalf of Company, shall engage the services of all personnel required in connection with the recording of the Master to be produced hereunder. You shall not incur any costs until Company has approved a budget.

(b)     You will deliver to Company copies of substantiating invoices, receipts, vouchers and similar satisfactory documentary evidence of recording costs, and if you fail to do so, Company's obligations to pay such costs will be suspended until delivery thereof. To the extent that the recording costs in connection with the Master produced hereunder exceed the recording

- 5 -

budget therefor, you shall be solely responsible for payment of such excess costs, if such excess costs are solely caused by your acts or omissions. Nothing contained in this Agreement shall obligate Company to permit the continuation of any recording session or project if Company reasonably anticipates that the recording costs will exceed those specified in the approved budget or that the Master being recorded will not be technically and commercially satisfactory. In the event that Company, in its sole discretion, pays any such excess costs caused directly by Producer's acts or omissions, you shall promptly reimburse Company therefor upon demand. Moreover, Company shall have no obligation to pay (i) any Recording Costs with respect to the Master which is not recorded in accordance with all of the material terms and conditions of this Agreement, (ii) any recording fees or arranging fees which exceed union scale (unless such excess and the proposed recipient thereof are specified in the proposed budget and approved by Company), and (iii) any penalties, fines, late charges or other costs incurred for late payment of Recording Costs solely caused by your acts or omissions. In the event that Company pays any costs or fees described in the preceding sentence, you shall be deemed responsible for such costs or fees so paid by Company, and you shall promptly reimburse Company therefor upon demand. Any sums paid by Company and not promptly reimbursed by you as provided in this paragraph may, at Company's sole election and without limiting Company's rights, be applied by Company in reduction of any record royalties (excluding mechanical royalties) and other sums payable to you under this Agreement. Without limiting any of Company's rights or remedies, or any of your representations, warranties, obligations or agreements herein, Company hereby acknowledges that there are no excess costs of which Company is as of the date hereof.

(c)     Notwithstanding anything to the contrary contained in this Agreement, it is specifically understood and agreed that no record royalties (excluding mechanical royalties) shall be payable to you hereunder unless and until Company and/or Distributor has recouped all recording costs incurred in connection with the Album from the "net artist" royalties (i.e., those royalties payable by Company to Artist for each such master recording, excluding the royalties payable to all third parties including Producer in connection with the Album). After recoupment of such recording costs (excluding the producer advance and so-called "artist" advances, if any) in accordance with the preceding sentence, royalties shall be payable to you hereunder for all records sold for which royalties are payable, retroactively from the first such record sold, subject to recoupment from such royalties of all advances paid to you hereunder.

5.     Royalties.

In consideration of the rights granted to Company and Distributor and all services rendered by you and Producer in connection with the Masters, and conditioned upon your and Producer's full performance of all of the material terms and conditions of this Agreement, Company shall accrue to your account a royalty as follows:

(a)     A royalty of four percent (4%) of the Royalty Base for Net Sales through Normal Retail Channels in the United States ("USNRC Net Sales") of Albums.

- 6 -

(b)    With respect to audiovisual recordings ("Videos") embodying the Master produced hereunder, your royalty shall be an amount equal to fifty (50%) percent of the amount determined by multiplying Artist's royalty for such Video by a fraction, the numerator of which is equal to your basic royalty rate pursuant to paragraph 5(a) above and the denominator of which is equal to Artist's basic royalty rate for net sales of the Album in the United States, and to the extent the Video includes masters or other material which is not produced hereunder, your royalty shall be pro- rated as provided in paragraph 5(c) below. Notwithstanding anything to the contrary contained herein, you shall not be credited with any royalty in respect of a Video unless and until all costs incurred in the production of such Video have been recouped from Artist's royalty therefor and following such recoupment your royalty for such Video shall be credited to your account on a prospective basis only. Company shall cause Distributor to provide statements to Producer of Video royalties as set forth in paragraph 6 below.

(c)    As to records (including the Album) not consisting entirely of the Masters produced hereunder, the royalty rate otherwise payable to you hereunder with respect to sales of any such record shall be pro-rated by multiplying such royalty rate by a fraction, the numerator of which is the number one (1) and the denominator of which is the total number of royalty-bearing masters (including the Masters) embodied thereon. Notwithstanding the foregoing, with respect to the initial commercial release in the United States of any single record embodying the Master produced hereunder, as the so-called "A" side and another master recording as the so-called "B" side, your royalty hereunder in respect of such sales of such single shall not be pro-rata pursuant to the immediately preceding sentence due to the fact that the master recording embodied on such "B" side was not produced by Producer. Notwithstanding any thing to the contrary contained in this Agreement, with respect to the initial release of any single embodying the Master produced hereunder as the "b" side and another master recording as the "A" side, you shall not be entitled to any royalty hereunder with respect to such single provided that the Producer of the master recording included as the "A" side of such single is entitled to so-called "A" side protection with respect to such single.

(d)    In the event the Master is produced by you with another producer to whom Company shall be obligated to pay a royalty, then the royalty payable to you hereunder with respect to such Master shall be reduced by the royalty payable by Company to such other producer(s) or individual(s). In the event a third party is engaged by Company to produce, co-produce, edit, mix or remix any Master or perform additional services with respect to the Master produced hereunder, then the royalty payable to you hereunder shall not be reduced.

(e)    In the event that Company is credited with any so-called "Direct Monies" from third parties other than Distributor (e.g., monies from Sound Exchange but specifically excluding publishing monies) attributable to a Master, Company shall pay you your pro-rated share of such Direct Monies determined by multiplying such Direct Monies by a fraction, the numerator of which is the your basic royalty rate and the denominator of which is the Artist's "all-in" basic

- 7 -

royalty. Company will instruct Sound Exchange to pay to you directly by way of a letter if direction attached hereto as Exhibit "B" your applicable pro-rata share of such Sound Exchange monies, provided that Company's inadvertent failure to do so shall not constitute a breach of this Agreement.

6. Accountings.

(a)    Company shall cause Distributor to account directly to you at the same time Distributor accounts to Company via an irrevocable letter of direction.    Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made by Distributor to you on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as Distributor may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by you during such preceding half-year, less Advances or other recoupable and/or deductible amounts hereunder. Distributor shall have the right to hold reserves in respect of sales hereunder in an amount equal to the reserves established for Company, or, if any Master produced hereunder is embodied on a Soundtrack, compilation or similar album, equal to the reserves established for the primary rights grantor.  Notwithstanding the foregoing, if Distributor fails to account directly to you, then Company shall account to you within thirty (30) days of Company's receipt from Distributor of the statement and payment, if any. In so accounting to you, Company shall have the right to rely on the statements rendered to us by Distributor.

(b)    Intentionally Omitted.

(c)    Royalties in connection with the exploitation of the Master hereunder shall be computed in the same national currency as Distributor is accounted to by its licensees and shall be paid at the same rate of exchange as Distributor is paid, and shall be subject to any taxes applicable to royalties remitted by or received from foreign sources, provided, however, that royalties on Records sold outside the United States shall not be due and payable by Company or Distributor until payment therefor has been received by Distributor in the United States in United States Dollars. If Distributor shall not receive payment in the United States, or in United States Dollars, and shall be required to accept payment in a foreign country or in foreign currency, Distributor shall deposit to the credit of you (at your request and expense), in such currency in a depository of your choice in the country in which Distributor is required to accept payment, your share of royalties due and payable to you with respect to such sales. Deposit as aforesaid shall fulfill the obligations of Company and Distributor as to Record sales to which such royalty payments are applicable. If any law, government ruling or any other restriction affects the amount of the payments which Distributor's licensee can remit to Distributor, Distributor may deduct from your record royalties an amount proportionate to the reduction in such licensee's remittances to Distributor.

- 8 -

    (d)    All royalty statements rendered by Company or Distributor to you shall be binding upon you and not subject to any objection by you for any reason, except in the case of fraud, unless specific objection in writing, stating the basis thereof, is given to Company within two (2) years from the date actually rendered. Failure to make specific objection within said time period shall be deemed approval of such statement.

    (e)    You shall have the right at your own expense to audit Company's books and records only as the same pertain to the exploitation of the Master under this Agreement. You may make such an examination for a particular statement only once, and only within two (2) years after the date when Company or Distributor actually renders you said statement under paragraph 6(a) above. Such audit shall be conducted during Company's usual business hours, and at Company's regular place of business in the United States where Company keeps the books and records to be examined on reasonable written notice. Such audit shall be conducted by an independent certified public accountant or attorney.

    (f)    You acknowledge that Company's books and records contain confidential trade information. Neither you nor your representatives shall at any time communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records, unless the information is made public or compelled by court order.

    (g)    You will not have the right to bring an action against Company in connection with any royalty accounting or payments hereunder unless you commence the suit within two (2) years from the date such statement of accounting for royalties or such payment was due. If you commence suit on any controversy or claim concerning royalty accountings rendered by Company or Distributor under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim.

7.    <u>Advances.</u>

    (a)    In consideration of your and Producer's services hereunder, Company shall promptly pay to you a recoupable advance against royalties (but not inclusive of mechanical royalties) payable to you hereunder in the amount of Twenty Thousand Dollars ($20,000) (the "Producer Advance"). The Producer Advance shall be payable upon the execution of this Agreement by all parties hereto. You hereby authorize and direct Company to pay One Thousand Dollars ($1,000) of the Producer Advance on your behalf to Davis Shapiro Lewit & Hayes, LLP,

- 9 -

Attention: Damien Granderson, Esq., for Producer's legal fees. You acknowledge and agree that such payments shall constitute payments to you, and that Company shall have no liability by reason of any erroneous payments or failure to comply with your authorization. Company's compliance with the foregoing authorization will constitute an accommodation to you alone; Davis Shapiro Lewit & Hayes, LLP is not a beneficiary of it. You agree to indemnify and hold Company harmless from and against claims asserted against Company and damages, losses, liabilities, or expenses Company incurs by reason of any such payment or otherwise in connection herewith.

(b)    All amounts paid to you pursuant to paragraph 7(a) hereof (i.e., the Producer Advance), as well as all monies paid by Company to you or on your or Producer's behalf, during the Term of this Agreement (other than royalties paid pursuant to Paragraph 5 and 9 hereof), shall constitute advances hereunder and shall be recoupable from any record royalties payable to you hereunder.

8.    Restrictions.

(a)    Neither you nor Producer shall enter into any agreement or make any commitment which would detrimentally interfere with your or Producer's performance of any of the terms and provisions hereof.

(b)    Neither you nor Producer shall produce any selection or portion thereof produced hereunder for the purpose of making records for any person other than Company for a period of three (3) years after the date of delivery by you of the Master embodying such selection. In the event that you or Producer violate the foregoing restriction, Company and/or Distributor may, in addition to any other right or remedy which it may have on account of such breach, terminate its obligation to pay you any further royalties hereunder with respect to the exploitation of records containing the Master as to which the restriction was violated.

9.    Controlled Compositions.

(a)    (i)    To the extent that any composition (each a "Controlled Composition") embodied on the Master which is written, owner or controlled, in whole or in part, by you and/or Producer or Producer's designees or any person or entity in which you and/or Producer has a direct or indirect interest, Producer hereby grants Company and its designees a first use license with respect thereto. All such Controlled Compositions are hereby licensed to Company for the United States and Canada at a rate equal to one hundred percent (100%) of the U.S. minimum statutory copyright royalty rate (or minimum compulsory rate in Canada, or if there is no such rate, at a rate equal to one hundred percent (100%) of the current rate consistent with CMRRA in Canada on a general basis) as of the date the Master was initially recorded and shall not be subject to the any so-called "caps". Mechanical royalties shall only be payable on records for which royalties are payable hereunder. No mechanical royalties will be payable on non-record

- 10 -

royalty-bearing records. If any record released by Company contains more than one version or arrangement of the same Controlled Composition, Company shall not be obligated to pay more than one (1) time the above rate with respect to such Controlled Compositions on such record.

(ii)    Producer hereby license each Controlled Composition to Company for synchronization in audio-visual recordings (recordings embodying Artist's performance wherein fixed visual images [of Artist or otherwise] together with sound) and the exploitation thereof solely for promotional purposes (including, without limitation, in digital streamline and commercial tie-ins) without payment to Producer. Upon Company's reasonable written request Producer shall execute or cause Producer's publishing designee to execute and deliver to Company or Distributor, as applicable, all documents required by Company or Distributor, as applicable, to effectuate the purposes of this paragraph 9(a).

(b)    You and Producer hereby acknowledge on behalf of yourself, Producer, and Producer's publishing designee that Producer controls the following percentage in and to the underlying compositions (prior to any conveyance of copyright in connection with any so-called "interpolations" or "samples") embodied in the following Master:

"Streets is Watchin"          50%

10.    Company's Rights.

Each Master produced hereunder shall, from the inception of its creation, be considered a "work made for hire" (excluding the underlying musical composition) for Company within the meaning of the U.S. Copyright Law. If it is determined that a Master does not so qualify, then such Master, together with all rights in it (including the sound recording copyright but excluding the copyright in the underlying composition), shall be deemed transferred to Company by this Agreement. The Master (excluding the underlying musical composition) shall, from the inception of its creation, be entirely the property of Company in perpetuity, throughout the world, free of any claim whatsoever by you, Producer or by any persons deriving any rights or interests therefrom. Without limiting its rights, Company shall have the sole and exclusive right in perpetuity and throughout the territory:

(a)    To manufacture, advertise, sell, license or otherwise dispose of the Master and phonograph records derived therefrom upon such terms, and under such trademarks, as Company elects, or, in its sole discretion, to refrain therefrom;

(b)    To perform the Master publicly and to permit the public performance thereof by any method now or hereafter known; and

- 11 -

(c)     To use and publish your approved and Producer's approved name (including all professional, group and assumed or fictitious names), approved photographs and approved biographical material solely in connection with the promotion, exploitation and sale of derivatives of the Master (excluding any use in connection with endorsement of products or services). Company will make available to you or Producer for your and/or Producer's approval, at Company's office, any pictures of you and Producer or biographical material about you and Producer which it proposes to use as set forth in the previous sentence. In the event Producer does not disapprove of the use of said pictures or biographical material within five (5) business days after notifying you or Producer of such intended use, it will be deemed that said pictures or biographical material has been so approved. This paragraph will not apply to any material previously approved by Producer. No non-repetitive inadvertent failure to comply with this paragraph will constitute a breach of this Agreement, provided that Company shall cure any such failure prospectively.

11.     Representations and Warranties.

(a)     You and Producer represent, warrant, covenant and agree as follows:

(i)     You and Producer are free to enter into and perform this Agreement with Company, and are not and will not be under any disability, restriction or prohibition, contractual or otherwise, with respect to (i) your and Producer's right to execute this Agreement, (ii) your and Producer's right to grant all of the rights granted to Company hereunder, and (iii) your and Producer's right to fully perform each and every term and provision hereof. You agree not to do or attempt to do, or suffer to be done, during or after the term hereof, any act in derogation of or inconsistent with Company's rights hereunder.

(ii)     Solely to the extent of your contributions, neither the Master produced hereunder nor any of the contents thereof, nor the manufacture or sale of records made from such Master, nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by you or Producer and embodied or contained in or used in connection with the Master or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy. Without limiting the generality of the foregoing, you specifically represent and warrant that no selections recorded or to be recorded hereunder are subject to any re-recording restriction under any previous recording contract to which you or Producer may have been a party. Neither you nor Producer nor any person furnished by you rendering services in connection with the Master recorded hereunder is or will be a party to any contract which would in any way impair the rights granted to Company hereunder.

(iii)     Each Master delivered hereunder shall be free of all liens and encumbrances, and there shall be no claims, demands or actions of any nature pending,

- 12 -

threatened in writing or known to you or Producer with respect thereto which are not released prior to the delivery of the Master involved.

(iv)    The Master produced pursuant to this Agreement shall be produced under and in conformity with any union agreements to which the Master may at any time be or become subject.

(v)    All of your and Producer's representations and warranties shall be true and correct upon execution hereof and upon delivery of each Master hereunder, and shall remain in effect for so long as Company and its licensees, assignees, transferees or successors in interest have any rights in or to the Master. Company's acceptance of the Masters or other materials hereunder shall not constitute a waiver of any of your or Producer's representations, warranties or agreements in respect thereof.

(vi)    Company shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to Company hereunder, except as specifically provided in this Agreement. You will pay all royalties or other compensation (whether in lieu of royalties or otherwise) becoming due to Producer or to any persons engaged by you who perform or in any way contributed to the recording and/or production of the Masters delivered hereunder (other than Artist, side artists, other producers engaged by Company, or other persons engaged by Company).

(vii)    There is in existence between you and Producer a valid and enforceable agreement under the terms of which Producer is required to perform exclusively for you as an individual producer. You will waive none of your rights thereunder and shall take all steps necessary or desirable to keep the same in full force so that Company shall have the benefit of Producer's services as if Producer had contracted directly with Company.

(b)    Company represents, warrants, covenants and agrees as follows:

(i)    Company is free to enter into and perform this Agreement with you, and is not and will not be under any disability, restriction or prohibition, contractual or otherwise.

(ii)    Solely to the extent of Company's contributions, neither the Master produced hereunder nor any of the contents thereof, nor the manufacture or sale of records made from such Master, nor any other exploitation or use thereof, and no material, ideas or other properties furnished by Company and embodied or contained in or used in connection with the Master or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy.

12.    Samples.

- 13 -

(a)     You and Producer warrant and represent that all music and other material furnished by you and/or Producer, or any person furnished or engaged by you or Producer (including, without limitation, so-called "interpolations" and "samples"), and all arrangements, compositions, ideas, designs and invention of Producer and you in connection with the Master are or will be original with you and/or Producer or in the public domain throughout the world or used with the consent of the original owner thereof, and shall not infringe upon or violate any copyright, the right of privacy of any other right of any person or entity. Neither you nor Producer will "sample," "interpolate" or otherwise incorporate into the Master (for convenience "Sample" or "Sampling" herein) or permit any other party, excluding Artist and Company, to Sample any copyrighted or otherwise proprietary material ("Proprietary Material") belonging to any other person other than the Company (such party herein referred to as "Owner") without: (1) having notified Company of the Proprietary Material that you or your agent intend to use and the identity of the Owner(s) thereof; (2) obtained Company's prior written approval of such intended use; (3) secured from the applicable Owners, at your sole expense, a written agreement, in a form satisfactory to the Company, that Company and its licensees shall have the perpetual right to use such Proprietary Material in the Master and to use or otherwise distribute or exploit the Master containing such Proprietary Material for all record purposes and for use in music videos, in perpetuity, all either without any payment whatsoever to Owner(s) or upon payment to Owner(s) of a payment approved by Company (the "Clearance Effort"). Company shall have no obligation to approve or to make any such payment, and Company's approval of any such payment shall not constitute a waiver of any of Company's rights or remedies. In the event that the Master contains Proprietary Material other than disclosed ("Undisclosed Samples"), and/or if you have not obtained and delivered to Company all licenses, permissions or other authorizations required hereunder, such Master will be deemed to be not satisfactory for the manufacture and sale of phonograph records, regardless of the date that Company becomes aware of the existence of such Proprietary Material, and Company reserves the right to deem your service incomplete and performances unsatisfactory notwithstanding the distribution of the Master or any previous acknowledgement of your satisfactory performances embodies on the Master of the completion of your services. You and Producer warrant and represent that the Master hereunder shall not contain any Proprietary Material which has not been licensed so as to allow Company and its licensees to distribute the Master as fully contemplated in this Agreement. Notwithstanding anything to the contrary contained herein, Company may, at our sole election and solely as an accommodation to you, undertake control of the Clearance Efforts hereunder. You and Producer acknowledge and agree that any payments made by Company (or Distributor) in connection with the Clearance Efforts shall, without limitation of Company's and Distributor's rights and remedies, at our election, be deemed additional Recording Costs hereunder and shall be subject to the approved budget.

(b)     If Owner(s) seeks a share of the so-called "sound recording rights" and/or "publishing rights" for use of Proprietary Material furnished by you or Producer in connection with the Master:

- 14 -

(i)     In connection with the Clearance Efforts of so-called "sound recording rights" for the use of such Proprietary Material, and any and all Clearance Costs including without limitation, (A) contingency participation (whether expressed in royalty or penny-rate terms, and including any advance against such contingency participation) conveyed, or (B) flat-fee "buy out" paid to any Owner(s), shall among, Producer and Company, be considered a Record additional Recording Costs and shall not reduce the Producer Advance. The foregoing notwithstanding, you shall be responsible for your pro-rata share of the Clearance Costs based on a fraction, the numerator of which is equal to your royalty rate as set forth in paragraph 5(a) above, and the denominator of which is equal to Artist's basic "all-in" royalty rate for USNRC Net Sales of top line Albums. Clearance Costs as used herein, shall mean any and all costs incurred and/or payments made by Company in connection with the Clearance Efforts.

(ii)    In connection with the Clearance Efforts of so-called "publishing rights" for use of such Proprietary Material, any conveyance or assignment to Owner(s) of any contingency and/or administration and any and all Clearance Costs shall, as among you, Producer and Company, be borne solely by Producer and producer's publishing designee.

(d)     Solely to the extent of your contributions, you and Producer hereby warrant and represent that the Master produced hereunder does not contain any Proprietary Material. For the avoidance of doubt, you shall not be responsible for, nor shall your interest in the Controlled Composition be reduced as a result of Proprietary Material furnished by parties other than you or Producer.

13.    Indemnification.

You and Producer hereby agree to indemnify and hold Company and its successors, assigns, agents, distributors, licensees, officers, directors and employees (the "Company Parties") harmless against any third party claim, liability, cost and expense (including reasonable outside attorneys' fees and legal costs) in connection with any third-party claim which is inconsistent with any agreement, covenant, representation, or warranty made by you herein, provided reduced to a final, adverse, non-appealable judgment by a court of competent jurisdiction. You will reimburse Company Parties upon demand for any payment made by Company Parties at any time after the date hereof (including after the Term of this Agreement) in respect of any third-party claim, liability, damage or expense to which the foregoing indemnity relates which is the result of a final non-appealable adverse judgment by a court of competent jurisdiction or settled with your consent, not to be unreasonably withheld (it being understood that your consent shall be deemed given to any settlement not in excess of Five Thousand Dollars ($5,000). Notwithstanding the foregoing, if you withhold consent to any settlement which Company Parties are willing to make, the foregoing indemnity shall apply and Company Parties may settle such claim in our sole reasonable, good faith discretion unless you promptly assume all costs attributable to the defense of such claim, demand or action, including, without

- 15 -

limitation court costs, reasonable outside attorneys' fees, and direct expenses theretofore incurred by Company Parties in connection with said claim, demand or action, or furnish Company Parties with an acceptable bond guaranteeing such payment, providing that in the event you assume said costs, Company Parties shall nonetheless have the right to settle such claim, demand or action in our sole reasonable, good faith discretion without your consent, provided that in such event, the foregoing indemnification shall not apply with respect thereto. Upon the making or filing of any such claim, action or demand, Company Parties shall be entitled to withhold from any amounts payable under this Agreement such amounts as are reasonably related to the potential liability in issue; provided, that Company shall not so withhold monies hereunder for more than one (1) year after Company receives notice of such claim, action or demand unless legal action with respect to such claim, action or demand is filed and served within such one (1) year period, or Company believes in its reasonable good faith judgment that such claim, action or demand is to be filed.

14.     Force Majeure.

        Company reserves the right by written notice to you to suspend the operation of this Agreement and its obligations hereunder for the duration of any contingencies by reason of which Company and/or Distributor is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable (but in no event longer than six (6) months): for example, labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond Company's control.

15.     Suspension and Termination.

        If at any time you or Producer fail to fulfill any of your or Producer's material obligations herein, then, without limiting Company's rights, Company shall have the option, exercisable at any time by notice to you, (i) to suspend Company's obligations to you hereunder during the period of default and/or (ii) to terminate this Agreement without any further obligation to you hereunder.

16.     Credit.

        Provided that you have fulfilled all of your material services hereunder, Company shall cause Distributor to accord you and Producer an appropriate credit on labels of records and the liner notes, sleeves and J-cards of Albums which embody the Master (including metadata), in the same size, font and prominence as the credit given to any other producers rendering services on the Album, as follows: "Produced by David Banner for b.i.G. f.a.c.e. Entertainment, Inc." Company shall use its best efforts to cause Distributor to accord you such credit in all one-fourth (1/4) page or larger trade and consumer advertisements relating solely to the Master which are

- 16 -

placed by or under Company's and/or Distributor's control and subject to Distributor's policy with respect thereto in the United States. Company's and/or Distributor's non-repetitive inadvertent failure to comply with the foregoing shall not be deemed to be a breach of this Agreement, provided that upon receipt of notice from you that you have not been accorded credit as set forth in this paragraph, Company shall use reasonable efforts to correct such failure on a prospective basis. The failure of any licensee of Company to comply with the aforesaid provisions shall not be deemed a breach hereof.

17.     Failure of Performance.

        (a)     No breach or alleged breach by Company of any of Company's obligations hereunder shall entitle you to recover damages or affect any of your obligations hereunder, unless such breach shall not have been remedied within thirty (30) days (fifteen (15) days in the case of nonpayment of monies payable hereunder) following receipt by Company of written notice specifying such breach or alleged breach and the details thereof. In no event whatsoever shall you or Producer have any right to seek or obtain injunctive relief against Company or Distributor (and/or Company's or Distributor's respective licensees or assigns).

        (b)     No breach or alleged breach by you of any of your obligations hereunder shall entitle Company to recover damages or affect any of Company's obligations hereunder, unless such breach shall not have been remedied within thirty (30) days following receipt by Company of written notice specifying such breach or alleged breach and the details thereof; provided, however, that the foregoing right to cure shall not be applicable to: (i) any of your obligations hereunder which must be performed within set, specific periods of time provided hereunder; (ii) the breach by you of any term or provision in this agreement that is not by its nature capable of being cured; or (iii) any breach by you which would subject Company to liability prior to the expiration of the thirty (30) day cure period.

18.     Legal and Equitable Relief.

        You acknowledge that your and Producer's services hereunder, as well as the Masters recorded and the rights and privileges granted to Company under the terms hereof, are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, and that, in the event of a breach by you or Producer of any material term, condition, representation, warranty or covenant contained herein, Company and Distributor may be caused irreparable injury and damage. You expressly agree that Company and Distributor shall be entitled to seek remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which Company and Distributor may have.

19.     Notices.

- 17 -

(a)    All notices to be given by either party hereunder shall be in writing and shall be delivered by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given. Royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail.

20.    Miscellaneous.

(a)    In rendering services hereunder, you and Producer shall have the status of an independent contractor and nothing contained in the Agreement shall contemplate or constitute you and/or Producer as Company's employee or agent and this agreement shall not be deemed to create a partnership, joint venture or agency relationship between Company and you and/or Producer. Notwithstanding the foregoing, Company shall have the right to withhold from any amounts payable to you hereunder any monies as may be required to be withhold under the provisions of any applicable code, statute, regulation, treaty or other law, and you shall promptly execute and deliver to Company such forms or other documents as may be required in connection therewith.

(b)    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, permitted assigns and representatives. We may assign this Agreement or any of its rights hereunder. You may not assign this Agreement or any of your respective rights hereunder except for the right to assign payments. This Agreement cannot be modified except by an instrument in writing executed by you and Company. A waiver of breach by any party in any one instance shall not constitute a waiver of any subsequent breach, whether or not similar.

(c)    Nothing contained herein shall obligate Company or Distributor to manufacture, distribute, promote or sell records derived from any Master.

(d)    This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof. The validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. Any claim, dispute or disagreement with respect to this agreement shall be submitted to the courts of the State of New York or the federal courts within the State of New York, which courts shall have exclusive jurisdiction thereof.

(e)    **You and Producer hereby warrant and represent that you have read and fully understand this Agreement; that Artist has advised you of your right to seek and obtain the advice of independent legal counsel in connection with the negotiation and execution of this Agreement and your rights and obligations hereunder; that you have either obtained such legal counsel or knowingly and voluntarily waived the right to such legal counsel without any coercion or other influence from Artist or Artist's**

- 18 -

representatives; and that you desire to enter into this Agreement without the benefit of legal counsel.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

YOUNG MONEY ENTERTAINMENT, INC.

By: _____
An Authorized Signatory

AGREED AND ACCEPTED:

b.i.G. f.a.c.e. Entertainment, Inc.

By: _____
An Authorized Signatory

The undersigned hereby acknowledges that they have read and are familiar with all the terms and conditions of the foregoing agreement; assent to the execution of the agreement, and agree to be bound by the terms and conditions thereof, including but not limited to each and every provision of the agreement that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the agreement, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the agreement by the undersigned and by b.i.G./f.a.c.e. Entertainment, Inc.

_____
Lavell Crump p/k/a "David Banner"

- 19 -

LETTER OF DIRECTION

Dated as of December 11, 2009

Cash Money Records, Inc.
c/o Law Office of Edward R. Grauer, P.C.
888 Seventh Avenue, Suite 500
New York, NY 10019

*Re:*    *b.i.G. f.a.c.e. Entertainment, Inc. f/s/o Lavell Crump p/k/a "David Banner" -w- Young Money Entertainment, LLC/Producer Agreement*

Gentlemen:

1.    The undersigned has engaged b.i.G. f.a.c.e. Entertainment, Inc. f/s/o Lavell Crump p/k/a "David Banner" (the "Producer") to produce one (1) master recordings (the "Master Recordings"), entitled "Streets is Watchin," embodying the musical performance of Artist under contract with the undersigned, which will be delivered by the undersigned pursuant to the label agreement between you and the undersigned dated as February 20, 2003, as amended and in full force as of the date hereof (the "Agreement").

2.    Although the Agreement requires the undersigned to pay for the services of the Producer, the undersigned hereby requests and irrevocably authorizes you to make payments for the Producer's services on the undersigned's behalf, as follows:

(a)    An advance (the "Producer Advance") of Twenty Thousand Dollars ($20,000) for the Master Recordings. Notwithstanding the foregoing, we hereby instruct you to direct the sum of One Thousand Dollars ($1,000) to Davis Shapiro Lewit & Hayes, LLP, Attention: Damien Granderson, Esq., for Producer's legal fees. The Producer Advance will be recoupable by you from all royalties (excluding mechanical royalties) becoming payable to Producer or for Producer's services under paragraph 2(b) below or otherwise. To the extent not so recouped, the Producer Advance may be recouped by you from any monies becoming payable to the undersigned, but all amounts so recouped from monies payable to the undersigned will be credited to the undersigned's royalty account if subsequently recouped from monies payable to the Producer. Each such Producer Advance will also be applied against the recording budget applicable to the Recordings under the Agreement

- 20 -

(b)     (i)     A royalty (the "Producing Royalty") with respect to the Master Recordings on net sales of all Phonograph Records, computed and paid in the same manner as the royalty payable to the undersigned under the Agreement, at the same times, and subject to the same conditions, but at the basic rate of four percent (4%) instead of the rate fixed in the Agreement with proportionate reductions on all sales for which reduced royalties are payable under the Agreement.

(ii)     The Producing Royalty will not be payable until you have recouped all Recording Costs attributable to the Recordings for the Album under the Agreement.  After recoupment of such recording costs (excluding the producer advance and so-called "artist" advances) in accordance with the preceding sentence, the Producing Royalty will be computed retroactively and paid on all such Records from the first Record sold, subject to recoupment from such royalties of the Producer Advance. Such recoupment will be computed at the undersigned's net royalty rate as reduced to reflect the deduction of the Producing Royalty.

3.     Your compliance with this authorization will constitute an accommodation to the undersigned alone; the Producer is not a beneficiary of it.  All payments to the Producer under this authorization will constitute payment to the undersigned and you will have no liability by reason of any erroneous payment or failure to comply with this authorization. The undersigned will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses you incur by reason of any such payment or otherwise in connection herewith.

4.     All monies becoming payable under this authorization will be remitted to the Producer at the following address or otherwise as the Producer directs you in writing: and will be accompanied by statements with respect to those payments.  (The undersigned understands that royalty payment instructions of this nature are usually placed in effect with respect to the accounting period in which you receive them if they are delivered to you within the first three (3) months of that period, and with respect to the next accounting period if delivered after that time, although administrative factors may result in variations from that procedure.)

b.i.G. f.a.c.e. Entertainment, Inc.
f/s/o Lavell Crump p/k/a "David Banner"
c/o Damien Granderson
689 Fifth Avenue   5th Floor
New York, New York 10022.

5.     Each Master Recording produced by the Producer shall be considered a "work made for hire" for you.  All such Recordings and the performances contained thereon (excluding the underlying musical composition) and Recordings derived therefrom shall from inception of their creation be entirely your property in perpetuity throughout the world, under copyright and

- 21 -

otherwise, free of any claim whatsoever by the undersigned and/or the Producer and/or any third party, and you shall have the right to register the copyrights in such Master Recordings in your name or in the name of your designee(s) and to secure any and all renewals and extensions thereof. Without limiting the generality of the foregoing, the Producer and the undersigned hereby assign to you all of our right and title to the copyrights (excluding the underlying musical composition) in perpetuity throughout the world in and to the Master Recordings, Recordings derived therefrom and any and all renewals and extensions of such copyrights.

Very truly yours,

YOUNG MONEY ENTERTAINMENT, LLC

By: _____
        An Authorized Signatory